# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL No. 2804 |
| | Case No. 1:17-md-02804 |
| This document relates to: | Judge Dan Aaron Polster |
| *Hospital Service District No. 1 of the Parish of LaSalle, State of Louisiana, d/b/a Hardtner Medical Center v. Purdue Pharma L.P. et al,* Case No. 1:18-op-46150 | **SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND** |

Plaintiff submits this supplemental pleading and Second Amended Complaint incorporating as if fully set forth herein its own prior pleadings and, if indicated below, the common factual allegations identified and the RICO causes of action included in the Corrected Second Amended Complaint and Jury Demand in the case of *The County of Summit, Ohio, et al., v. Purdue Pharma L.P., et al.,* Case No. 1:18-op-45090 ("*Summit County* Pleadings"), *In Re National Prescription Opiate Litigation,* in the United States District Court for the Northern District of Ohio, Dkt #513, 514[1]), and as may be amended in the future, and any additional claims asserted herein.  Plaintiff also hereby amends its complaint to alter the defendants against which claims are asserted as identified below. To the extent defendants were previously sued in plaintiff(s)' existing complaint and they are no longer identified as defendants herein, they have been dismissed without prejudice except as limited by CMO-1, Section 6(e).  Doc. #232.

---

[1] Docket #513 is the redacted Summit Second Amended Complaint and Docket #514 is the unredacted Summit Corrected Second Amended Complaint filed under seal in Case No. 1:17-md-02804-DAP.  The redacted Summit Corrected Second Amended Complaint is also filed in its individual docket, Case No. 1:18-op-45090-DAP, Docket #24.

## INCORPORATION BY REFERENCE OF EXISTING COMPLAINT

1.      Plaintiff(s)' Existing Complaint and First Amended Complaint (No. 1:18-op-46150-DAP, Doc. #: 1 and Doc. #8)  is expressly incorporated by reference to this Short Form as if fully set forth herein except to the extent that allegations regarding certain defendants that are not listed in section 2 below are dismissed without prejudice.

## PARTIES – DEFENDANTS

2.      Having reviewed the relevant ARCOS data, Plaintiff asserts claims against the following Defendants:

PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; PAR PHARMACEUTICAL COMPANIES, INC.; JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; TEVA PHARMACEUTICAL INDUSTRIES LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ALLERGAN FINANCE LLC f/k/a ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS, INC.; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; INSYS THERAPEUTICS, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; SPECGX LLC; CARDINAL HEALTH, INC.; McKESSON CORPORATION; HEALTH MART SYSTEMS, INC.; AMERISOURCEBERGEN CORPORATION; AMERISOURCEBERGEN DRUG CORPORATION; H. D. SMITH, LLC f/k/a H. D. SMITH WHOLESALE DRUG CO; ANDA, INC.; CVS HEALTH CORP.; RITE AID CORP.; RITE AID OF MARYLAND, INC., d/b/a RITE AID MID-ATLANTIC CUSTOMER SUPPORT CENTER; WALGREENS BOOTS ALLIANCE, INC. a/k/a WALGREEN CO.; WALMART INC., f/k/a WALMART STORES, INC.; AMNEAL PHARMACEUTICALS LLC; INDIVIOR INC. F/K/A RECKITT BENCKISER PHARMACEUTICALS, INC.; MYLAN PHARMACEUTICALS, INC.; RHODES PHARMACEUTICALS L.P.; SANDOZ INC.; HIKMA PHARMACEUTICALS PLC D/B/A HIKMA PHARMACEUTICALS USA INC. F/K/A WEST-WARD PHARMACEUTICALS CORPORATION; LOUISIANA WHOLESALE DRUG COMPANY, INC; MORRIS & DICKSON CO., LLC; K & B LOUISIANA CORPORATION; LOUISIANA CVS PHARMACY, L.L.C.; WALGREEN LOUISIANA CO., INC.; ALBERTSON'S LLC; BEVERLY SACKLER; DAVID A. SACKLER; ILENE SACKLER LEFCOURT; JONATHAN D. SACKLER; KATHE A. SACKLER; MORTIMER D.A. SACKLER; RICHARD S. SACKLER; THERESA SACKLER; STUART BAKER; RAYMOND SACKLER TRUST; RHODES PHARMACEUTICALS INC.; RHODES TECHNOLOGIES; RHODES TECHNOLOGIES INC.; P.F. LABORATORIES, INC.

I, Richard J. Arsenault, Counsel for Plaintiff(s), certify that in identifying all Defendants, I have followed the procedure approved by the Court and reviewed the ARCOS data that I understand to be relevant to Plaintiff(s).

I further certify that, except as set forth below, each of the Defendant(s) newly added herein appears in the ARCOS data I reviewed.

I understand that for each newly added Defendant not appearing in the ARCOS data I must set forth below factual allegations sufficient to state a claim against any such newly named Defendant that does not appear in the ARCOS data.

The following newly added Defendant(s) *do not appear* in the ARCOS data I reviewed:

BEVERLY SACKLER; DAVID A. SACKLER; ILENE SACKLER LEFCOURT; JONATHAN D. SACKLER; KATHE A. SACKLER; MORTIMER D. A. SACKLER; RICHARD S. SACKLER; THERESA SACKLER; STUART BAKER; RAYMOND SACKLER TRUST; RHODES PHARMACEUTICALS INC.; RHODES TECHNOLOGIES; RHODES TECHNOLOGIES INC.; and P.F. LABORATORIES, INC.

Dated: __March 16, 2019__          Signed: _____/s/ Richard J. Arsenault_____

### 2.1     Factual Allegations Regarding Individual Defendants *not appearing* in the ARCOS data

1.      Defendants BEVERLY SACKLER, DAVID A. SACKLER, ILENE SACKLER LEFCOURT, JONATHAN D. SACKLER, KATHE A. SACKLER, MORTIMER D. A. SACKLER, RICHARD S. SACKLER, THERESA SACKLER, STUART BAKER, RAYMOND SACKLER TRUST, RHODES PHARMACEUTICALS INC., RHODES TECHNOLOGIES, RHODES TECHNOLOGIES INC., P.F. LABORATORIES, INC., and their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale and/or dispensing of opioids, are hereby added as Defendants by this pleading and Plaintiff sets forth the following factual and jurisdictional allegations:

2.      The new Defendants added fall into three categories: (a) Purdue-Related Additional

Defendants, which are entities and individuals related to original Defendants Purdue Pharma L.P. ("PPLP"), Purdue Pharma Inc. ("PPI"), and The Purdue Frederick Company, Inc. ("PFC") (collectively "Purdue"); (b) Additional Manufacturers, which are additional manufacturers of prescription opioids who engaged in the fraudulent marketing conduct described in Plaintiff's Original Complaint and/or failed to detect suspicious orders and prevent diversion of opioids to and within the Plaintiff's Community; and (c) Additional Distributors, which are additional wholesale distributors of prescription opioids who engaged in the conduct of the Distributors named in Plaintiff's Original Complaint.

### A.      Allegations Against the Purdue-Related Additional Defendants.

#### (1)      The Purdue-Related Additional Defendants.

3.      Purdue-Related Additional Defendants are entities and individuals associated with Purdue, but not named in Plaintiff's Original Complaint. Three Purdue entities, PPLP, PPI, and PFC, were named as Defendants in Plaintiff's Original Complaint; each of them was designated as a Defendant by the Plaintiff in its Original Complaint.  These three entities are members of a worldwide group of associated companies all of which are owned and controlled, directly or indirectly through family trusts and holding companies, 50% by the widow and descendants of Mortimer D. Sackler ("Mortimer Sackler Family") and 50% by the widow and descendants of Raymond R. Sackler ("Raymond Sackler Family") (together the Mortimer Sackler Family and the Raymond Sackler Family are referred to as the "Sackler Families"). At all relevant times, the Sackler Families jointly managed and controlled all of the associated companies that the two families owned. Each of the Purdue-related individuals and entities named herein as Additional Defendants knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in Plaintiff's Original Complaint; none is named merely because of his, her, or

its status as a shareholder, limited partner, member of a limited liability company, or beneficiary of a trust.

4.      Purdue has been sued by many plaintiffs for the role it played in creating the opioid epidemic, a role more fully described in Plaintiff's Original Complaint. The three Purdue entities originally sued, PPLP, PPI, and PFC, may, however, lack sufficient assets to satisfy their liabilities to those plaintiffs, other creditors, and Plaintiff, because billions of dollars of profits from Purdue's sale of opioids has been distributed to the Sackler Families since the 1980s. Accordingly, by this pleading, Plaintiff is adding as Defendants those members of the Sackler Families and their controlled entities who knowingly participated in the wrongdoing of Purdue as alleged in Plaintiff's Original Complaint, and who knowingly received the benefits of that wrongdoing.

5.      Defendant **RICHARD S. SACKLER** is a natural person residing in Travis County, Texas.  He is a son of Raymond Sackler and, beginning in the 1990's, served as a member of the Board of Directors of Purdue and Purdue-related entities.

6.      Defendant **JONATHAN D. SACKLER** is a natural person residing in Fairfield County, Connecticut. He is a son of Raymond Sackler and has been a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

7.      Defendant **MORTIMER D.A. SACKLER** is a natural person residing in New York County, New York.  He is the son of Mortimer Sackler and has been a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

8.      Defendant **KATHE A. SACKLER** is a natural person residing in Fairfield County, Connecticut. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

9.      Defendant **ILENE SACKLER LEFCOURT** is a natural person residing in New

York County, New York. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

10.     Defendant **BEVERLY SACKLER** is a natural person residing in Fairfield County, Connecticut. She is the widow of Raymond Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

11.     Defendant **THERESA SACKLER** is a natural person residing in New York County, New York.  She is the widow of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

12.     Defendant **DAVID A. SACKLER** is a natural person residing in New York County, New York.  He is the son of Richard Sackler (and thus grandson of Raymond Sackler) and has served as a member of the board of directors of Purdue and Purdue-related entities since 2012.

13.     Defendant **RHODES TECHNOLOGIES** ("Rhodes Tech") is a Delaware general partnership formed on April 12, 2005 with its principal place of business in Coventry, R.I. At relevant times, Rhodes Tech or its predecessor has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations.

14.     Defendant **RHODES TECHNOLOGIES INC.** ("Rhodes Tech Inc.") is a Delaware corporation formed January 28, 1999 with its principal place of business in Coventry, R.I. Rhodes Tech Inc. is a general partner of Rhodes Tech. At relevant times, Rhodes Tech Inc. has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations or has managed Rhodes Tech or its predecessor in doing so.

15.     Defendant **RHODES PHARMACEUTICALS L.P.** ("Rhodes Pharma") is a Delaware limited partnership formed November 9, 2007 with its principal place of business in Coventry, R.I. At all relevant times, Rhodes Pharma has marketed a generic form of OxyContin which is manufactured by Purdue Pharmaceuticals L.P. ("PPNC"), a Delaware limited partnership, which is a subsidiary of Defendant PPLP and which owns and operates a pharmaceutical manufacturing facility in Wilson, North Carolina.

16.     Defendant **RHODES PHARMACEUTICALS INC.** ("Rhodes Pharma Inc.") is a New York corporation formed on November 9, 2007. Rhodes Pharma Inc. is a general partner of Rhodes Pharma. At all relevant times, Rhodes Pharma Inc. has marketed a generic form of OxyContin which is manufactured by PPNC.

17.     Defendant **TRUST FOR THE BENEFIT OF MEMBERS OF THE RAYMOND SACKLER FAMILY** (the "Raymond Sackler Trust") is a trust of which Defendants Beverly Sackler, Richard S. Sackler, and/or Jonathan D. Sackler are trustees. It is the 50% direct or indirect beneficial owner of Purdue and the Purdue-related Additional Defendants and the recipient of 50% of the profits from the sale of opioids by Purdue and the Purdue-related Additional Defendants.

18.     Defendant **THE P.F. LABORATORIES, INC.** ("PF Labs") is a New Jersey corporation with its principal place of business located in Totowa, New Jersey. It was, at relevant times, engaged in the business of manufacturing OxyContin for Purdue. At all relevant times, PF Labs has been beneficially owned, managed, and controlled by Defendant Sackler Family members.

19.     Defendant **STUART D. BAKER** is a natural person residing in Suffolk County, New York.  He has served as a senior executive of, and/or counsel to, Purdue, Purdue-related

entities, and members of the Sackler Families since the 1990s.

20.     Defendants Richard S. Sackler, Jonathan D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, Stuart Baker, Rhodes Tech, Rhodes Tech Inc., Rhodes Pharma, Rhodes Pharma Inc., Raymond Sackler Trust, and PF Labs are "Manufacturer Defendants" and "Marketing Defendants" as used in Plaintiff's Original Complaint. Plaintiff adopts all allegations and causes of action alleged against the Manufacturer and Marketing Defendants in its Original Complaint against these Defendants as if fully set forth herein.

### (2)     The Purdue-Related Additional Defendants Participated in and Profited from Purdue's Wrongdoing.

#### (a)     *Structure of the Purdue Entities and the Roles of the Individual Purdue-Related Defendants.*

21.     At all relevant times, the Sackler Families – in particular, as detailed below, Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Beverly Sackler, Theresa Sackler, Ilene Sackler Lefcourt, David Sackler, and Raymond Sackler Trust ("Sackler Defendants") – controlled Purdue and its associated companies. Purdue is part of a complicated web of entities through which the Sackler Families operate. PPI is the managing general partner of PPLP and of many of the various Purdue-related entities. Its status as managing general partner of the various entities ensures PPI's control of those entities. In turn, at all relevant times, all of the members of the board of PPI have been members of the Sackler Families or Sackler-family retainers. The Purdue-related Additional Defendants that are not controlled by the Sackler Defendants through PPI are controlled by them through different entities unknown to Plaintiff.

22.     Because the Sackler Families control of the board of PPI, the officers of PPI and PPLP reported to them. This ensured Sackler control of PPI and PPLP, even when the officers of

those entities were not themselves members of the Sackler Families.

23.     The Sackler Defendants are beneficial owners of, and exercise complete control over, all four Rhodes Defendants and PF Labs.

24.     The Sackler Defendants made the decision that the Sackler Families should enter the generic market for OxyContin in or about 2008 and that it should do so through Rhodes Pharma, a Sackler-owned entity created for that purpose.

25.     The Sackler Defendants caused Purdue and other associated companies that they beneficially owned and controlled to distribute to the Sackler Families hundreds of millions of dollars of profits earned by Purdue and its associated companies from the sale of opioids.

26.     Each of the Sackler Defendants named herein has served on the board of directors of, or as an officer of, Purdue and one or more Purdue-related Additional Defendants.

27.     The Sackler Defendants beneficially own and control all of the entities owned by the Sackler Families, including PF Labs and the Rhodes Defendants, in substantially the same way as they control PPLP and its affiliates, although they may do so using different holding companies and trusts than those used to control PPLP.

28.     At all relevant times, Richard Sackler played an active and central role in the management of Purdue and the Purdue-related Additional Defendants. He began working for Purdue as Assistant to the President (his father, Raymond) in the 1970s. He later served as Vice President of Marketing and Sales. In the early 1990s he became Senior Vice President, which was the position he held at the time OxyContin was launched in 1996. In 1999, he became President, and he served in that position until 2003.

29.     Richard Sackler resigned as President in 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and

crimes. However, he continued to serve, with his uncle Mortimer, as Co-Chair of the Board of Purdue. In that way, among others, the family maintained control over their family business, even though they were no longer officers, because the officers reported to them.

30.     As a senior executive of Purdue, Richard Sackler was actively involved in the invention, development, marketing, promotion, and sale of Purdue's opioid products, including OxyContin. He worked tirelessly to make OxyContin a blockbuster, telling colleagues how devoted he was to the drug's success. Along with his father (Raymond) and his uncle (Mortimer), he launched OxyContin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by his uncle Arthur. Within five years of its introduction, OxyContin was generating a billion dollars a year. When OxyContin met with resistance, Richard participated in Purdue's efforts to counter that resistance.

31.     At all relevant times, Richard Sackler served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related Additional Defendants.

32.     Richard Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related Additional Defendants named herein as additional Defendants from the sale of opioids.

33.     Jonathan Sackler was a Vice President of Purdue in 1991, and by 2000 he was a Senior Vice President. Like his brother Richard, he resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the board of Purdue.

34.     At all relevant times, Jonathan Sackler served as a trustee or one or more trusts that beneficially owns and control Purdue and the Purdue-related Additional Defendants.

35.     Jonathan Sackler is the direct or indirect beneficiary of some portion of 25% of the

profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

36.     Mortimer D.A. Sackler served as a Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. He resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the Board of Purdue.

37.     Mortimer D.A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

38.     Kathe A. Sackler was a Vice President of Purdue in 1991, and by 2000 she was a Senior Vice President. She resigned that position in or about 2003 due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

39.     Kathe A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

40.     Ilene Sackler Lefcourt served as Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. She resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

41.     Ilene Sackler Lefcourt is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

42.     At all relevant times, Beverly Sackler served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related Additional Defendants and to which 50% of the profits of Purdue and the Purdue-related Additional Defendants from the sale of opioids has been conveyed. She has also served as a member of the board of directors of Purdue and

Purdue-related entities since the 1990s.

43.     Beverly Sackler is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

44.     Theresa Sackler is the direct or indirect beneficiary of 50% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids. She has also served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

45.     David A. Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids. He has also served as a member of the board of directors of Purdue and Purdue-related entities since 2012.

46.     Stuart Baker joined Purdue in 1994 as Executive Vice President of PPLP and as Vice President of PF Co. He served as legal counsel to the entire Purdue organization and the Sackler Families. He also served as an officer of other Sackler-owned, Purdue-related entities. He served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related Additional Defendants. He served as Corporate Secretary for Purdue, and as such he gained direct knowledge of the wrongdoing alleged in Plaintiff's Original. In his capacity as an officer, director, and lawyer, he knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in Plaintiff's Original and knowingly aided and abetted the Sackler Families, and the Purdue-related Additional Defendants, to structure their personal affairs and the personal and business organizations they beneficially owned and controlled in such a way as to attempt to evade personal liability for the wrongdoing in which he knew they had engaged and in which he knew they intended to continue to engage.

47.     The Sackler Families are the sole beneficial owners of Purdue and its associated

companies and the Purdue-related Additional Defendants. All of Purdue's and its associated companies' profits go to Sackler-family trusts and entities.

48.     Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David Sackler, Rhodes Tech, Rhodes Tech Inc., Rhodes Pharma, Rhodes Pharma Inc., the Raymond Sackler Trust (through its trustees), P.F. Labs, and Stuart D. Baker each knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in Plaintiff's Original Complaint.

### (3)     The Sacklers and the Integration of Advertising and Medicine.

49.     As set forth in Plaintiff Original Complaint and herein, before the Defendants in this action began their marketing campaign for prescription opioids, generally accepted standards of medical practice dictated that opioids should only be used short-term, for instance, for acute pain, pain relating to recovery from surgery, or for cancer or palliative care. In those instances, the risks of addiction are low or of little significance.  The commercial success of prescription opioids thus would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of long-term opioid use.

50.     As it turned out, Purdue was uniquely positioned to execute just such a maneuver, thanks to the legacy of Arthur Sackler, the (now-deceased) brother of Raymond and Mortimer Sackler.

51.     Arthur Sackler created the pharmaceutical advertising industry as we know it— laying the groundwork for the OxyContin promotion that would make the Sacklers billionaires.

52.     Arthur Sackler, a psychiatrist turned "ad man," was both a psychiatrist and a marketing executive, and, by many accounts, a brilliant and driven man. He pursued two careers simultaneously, as a psychiatrist at Creedmoor State Hospital in New York and the president of an

13

advertising agency called William Douglas McAdams. Arthur pioneered both print advertising in medical journals and promotion through physician "education" in the form of seminars and continuing medical education courses. He understood the persuasive power of recommendations from fellow physicians, and did not hesitate to manipulate information when necessary. For example, one promotional brochure produced by his firm for Pfizer showed business cards of physicians from various cities as if they were testimonials for the drug, but when a journalist tried to contact these doctors, he discovered that they did not exist.

53.     Arthur Sackler revolutionized medical marketing in the 1950's and 60's by creating the very marketing ploys his family later used to perpetuate the massive fraud alleged in this action. In striving to make Pfizer (with its blockbuster drug, valium) a household name among physicians, Arthur Sackler recognized that "selling new drugs requires a seduction of not just the patient but the doctor who writes the prescription," and he maximized influence over physician prescribing by developing the following marketing ploys to disseminate pharmaceutical messaging to the masses under the guise of science and truth:

        a.   contacting prescribers directly with a variety of perks, benefits and even job offers;

        b.   publishing seemingly neutral articles in medical journals, citing scientific studies (frequently underwritten by the pharmaceutical companies whose products he was marketing);

        c.   marketing illnesses (i.e., lamenting and marketing the under treatment of purported illnesses and the corresponding under-utilization of drugs he was promoting);

        d.   paying prominent physicians to endorse his products; and

        e.   funding continuing medical education programs ("CME's"), controlling the messaging of key opinion leaders, and maximizing influence over physician

prescribing practices.

54.     In the 1960s, Arthur Sackler made Valium into the first hundred0-million-dollar drug, so popular it became known as "Mother's Little Helper." His expertise as a psychiatrist was one of the keys to his success. When Arthur's client, Roche, developed Valium, it already had a similar drug, Librium, another benzodiazepine, on the market for treatment of anxiety. So Arthur invented a condition he called "psychic tension"—essentially stress—and pitched Valium as the solution. The campaign, for which Arthur was compensated based on volume of pills sold, was a remarkable success.

55.     In marketing tranquilizers Librium and Valium, Arthur Sackler broadened his customer base to potentially include everyone.  For example, one campaign encouraged doctors to prescribe Valium to people with no psychiatric symptoms whatsoever, urging doctors to "consider the usefulness of Valium" in patients with *no* demonstrable pathology. Such marketing led one physician, writing in the journal *Psychosomatics* in 1965, to ask, "When do we *not* use this drug?'"

56.     As the line between medical education and medical marketing became very deliberately blurred, Valium became the pharmaceutical industry's first hundred-million-dollar, and then billion-dollar, drug. For his design and creation of these medical marketing strategies, he was posthumously inducted into the Medical Advertising Hall of Fame, but as succinctly put by Allen Frances, the former chair of psychiatry at Duke University School of Medicine: "'*Most of the questionable practices that propelled the pharmaceutical industry into the scourge it is today can be attributed to Arthur Sackler*.'"

57.     In other precursors of the current crisis, Arthur Sackler promoted these drugs despite the lack of any studies of their addictive potential.  Additionally, he started his own newspaper, the *Medical Tribune*, despite concerns that a pharmaceutical advertiser should not be

publishing a medical periodical directed at doctors. He paid Key Opinion Leaders ("KOLs"), including for example, Henry Welch (then chief of FDA's antibiotics division), almost $300,000 in exchange for his help in promoting pharmaceutical drugs. By the 1970's, doctors were prescribing more than 100 million tranquilizer prescriptions annually, creating what Sen. Edward Kennedy called "'a nightmare of dependence and addiction.'"

### (4)     The Sackler Families and the Development of OxyContin.

58.     The Sackler brothers—Arthur, Mortimer, and Raymond—purchased a small patent-medicine company called the Purdue Frederick Company ("PF Co.") in 1952.

59.     PF Co. had been formed in 1892 by Dr. John Purdue Gray and George Frederick Bingham and incorporated in New York on June 29, 1911.

60.     After Arthur's death, Mortimer and Raymond bought out his share. Since that time PF Co. and its associated companies have all been owned by the Raymond Sackler Family and the Mortimer Sackler Family.

61.     PF Co. is no longer an active New York corporation, having been merged into PF Labs on May 7, 2004.

62.     At all relevant times, PF Co. and PF Labs have been beneficially owned by the Sackler Families and controlled by them through Defendant Sackler Family members.

63.     After the Sackler brothers acquired PF Co. in 1952, they sold products ranging from earwax remover to antiseptic, and it became a profitable business. As an advertising executive, Arthur was not involved, on paper at least, in running the family business because that would have been a conflict of interest. Raymond became the head executive of the family's US business while Mortimer ran the UK side of the business.

64.     Beginning in the 1980s PF Co. and its associated companies engaged in the

business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling or distributing opioids throughout the United States.

65.     In the 1980s, the Sackler Families, through a UK affiliate, acquired a Scottish drug producer that had developed a sustained-release technology suitable for morphine. PF Co. marketed this extended-release morphine as MS Contin. It quickly became the Sackler Families' best seller. As the patent expiration for MS Contin loomed, the Sackler Families searched for a drug to replace it. Around that time, Richard Sackler had become more involved in the management of the families' businesses. Richard had grand ambitions for the family business; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean *really* big." Richard believed Purdue should develop another use for its "Contin" timed-release system.

66.     In 1990, Purdue's VP of clinical research, Robert Kaiko, sent a memo to Richard and other executives recommending that the company work on a pill containing oxycodone. At the time, oxycodone was perceived as less potent than morphine, largely because it was most commonly prescribed as Percocet, the relatively weak oxycodone-acetaminophen combination pill, or Percodan, where it was blended with aspirin. By contrast, the oxycodone pill developed by Purdue – OxyContin -- was pure oxycodone in a time-release formula similar to MS Contin, and it was more potent than morphine.  Purdue also decided to produce pills with as much as 160 milligrams of oxycodone, far in excess of any other prescription opioid.

67.     OxyContin was created by PF Co., but responsibility for designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling, and distributing OxyContin and other opioid products was shared among PF Co., Purdue, PF Labs, and other Purdue-related companies.

68.     At relevant times, OxyContin was manufactured by PF Labs.

69.     MS Contin had always been limited by the stigma associated with morphine. Oxycodone did not have that problem, and what is more, it was sometimes mistakenly called "oxycodeine," which also contributed to a false perception of relatively lower potency, because codeine is weaker than morphine. Purdue acknowledged using this false perception to its advantage when it eventually pled guilty to criminal charges of "misbranding" in 2007, admitting that it was "well aware of the incorrect view held by many physicians that oxycodone was weaker than morphine" and "did not want to do anything 'to make physicians think that oxycodone was stronger or equal to morphine' or to 'take any steps . . . that would affect the unique position that OxyContin'" held among physicians.

70.     Even though oxycodone did not have the same stigma as morphine, in focus groups conducted before OxyContin's release, Purdue learned that doctors were concerned about the abuse potential of opioids.  The focus group concluded that the perceived abuse potential of opioids was the "'biggest negative' that might prevent widespread use of the drug."

71.     For Purdue and OxyContin to be "*really* big," Purdue needed to both distance its new product from the traditional view of narcotic addiction risk, and broaden the drug's uses beyond cancer pain and hospice care. A marketing memo sent to Purdue's top sales executives in March 1995 recommended that if Purdue could show that the risk of abuse was lower with OxyContin than with traditional immediate-release narcotics, sales would increase. As discussed below, Purdue did not find or generate any such evidence, but this did not stop Purdue from making that claim regardless.

72.     Despite the fact that there has been little or no change in the amount of pain reported in the U.S. over the last twenty years, Purdue recognized an enormous untapped market for its new

18

drug. As Dr. David Haddox, a Senior Medical Director at Purdue, declared on the Early Show, a CBS morning talk program, "There are 50 million patients in this country who have chronic pain that's not being managed appropriately every single day. OxyContin is one of the choices that doctors have available to them to treat that."

> **(5)** **Purdue's Officers and Directors Knew About, and Participated in, Purdue's Wrongdoing.**

73. The members of the board of Purdue were intimately involved in the activities of the entities that they managed, often on a weekly or even daily basis.

74. Purdue, PF Co., PF Labs, and the Sackler Families launched OxyContin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by Arthur. They trained and armed a force of approximately 1,000 sales representatives with charts showing OxyContin's purported benefits. A major thrust of the sales campaign was that OxyContin should be prescribed not merely for the kind of severe short-term pain associated with surgery or for cancer pain but also for less acute, longer-lasting pain, such as arthritis, back pain, sports injuries, fibromyalgia. The number of conditions that OxyContin could treat seemed almost unlimited.

75. The training included "training in 'overcoming objections' from clinicians." "If a doctor inquired about addiction," the representative was instructed to respond thus: "'The delivery system is believed to reduce the abuse liability of the drug.'" Another sales representative said that Purdue executives "told us to say things like it is 'virtually' non-addicting."

76. Purdue sales representatives were provided with studies and literature provided by other physicians. Purdue had a speakers' bureau through which it paid several thousand doctors to attend medical conferences and deliver presentations about OxyContin's merits. "Doctors were offered all-expenses-paid trips to pain-management seminars in places like Boca Raton." Internal

documents reflect that doctors who attended these seminars wrote OxyContin prescriptions more than twice as often as those who didn't.

77. Purdue also advertised in medical journals and produced promotional videos featuring not just satisfied patients but also doctor's testimonials. "The marketing of OxyContin relied on an empirical circularity: the company convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company."

78. According to a former OxyContin sales representative, Richard Sackler was "'the dude that made it happen.'" Richard Sackler himself was tireless in his dedication to OxyContin's success. When benefit plans began citing OxyContin abuse as an excuse not to pay, Richard Sackler sent an email to sales representatives stating that, for insurers, "'addiction' may be a convenient way to just say 'NO.'"

79. Members of the Sackler family were daily on site at Purdue's headquarters, controlling the management of their family business and all of its employees.

80. Richard Sackler is named as inventor on some 50 patents relating to oxycodone and other pain medications, including several patents apparently issued as late as 2016. Virtually all such patents invented by Richard Sackler were assigned to Purdue.

81. In 1997, both Richard and Kathe Sackler were part of a conspiracy to deceive physicians into believing that oxycodone was half as strong as morphine, when in fact the opposite was true; this deception was known by Purdue to ease the fears of well-meaning and careful physicians about prescribing OxyContin for non-cancer pain uses.

82. In the late 1990s Richard, Jonathan and Kathe Sackler participated in an unlawful attempt to deceive European drug regulators into classifying OxyContin as totally uncontrolled, i.e., capable of being obtained without a prescription, despite the fact that all of these family

members were by then well aware of the abuse liability of the drug in the U.S.

83.     In 2001, Kathe Sackler attended a talk given by the chief medical officer of Sikorsky Aircraft, in which the speaker expressed grave concern about the risks associated with OxyContin; instead of acknowledging this fact to the medical officer, Kathe Sackler instead remained silent and returned to the Purdue headquarters, where employees were directed to find ways to undercut and deflect the Sikorsky medical officer's concerns.

84.     In the period around 1999-2003, Purdue developed a method to cause company emails to self-destruct at a pre-determined time; this was an attempt to create a system where potentially incriminating documents would automatically self-destruct, even after receipt by unrelated third-parties. Richard, Jonathan and Kathe Sackler all were directly aware and supportive of this project.

### (6)     Members of the Sackler Families Were Aware of Risks Associated With OxyContin No Later Than the Summer of 1999.

85.     That prescription opioids would lead to addiction, and specifically that OxyContin could be, and was  being, abused has been known to Purdue and to the members of the Sackler Families involved in running the family business since at least the summer of 1999.

86.     In summer of 1999, a Purdue sales representative wrote to the President of Purdue reporting widespread abuse of OxyContin.  As a result of that memo, a secretary at Purdue, Maureen Sara, was tasked with doing research on the Internet to learn about the nature and scope of the abuse, specifically to learn about how recreational drug users were misusing OxyContin.

87.     In order to carry out her assignment, Ms. Sara began visiting drug-user Internet "news groups" or "chat rooms" on a daily basis.  Two groups in particular that Ms. Sara visited were alt.drugs and alt.drugs.hard.  For a period of time, in the late summer and early fall of 1999, Ms. Sara would forward screen shots from these news groups on a daily basis to Howard Udell,

then General Counsel of Purdue.

88.     In October or November, 1999, Ms. Sara prepared a memo summarizing her research into misuse of OxyContin.  The memo described how users would remove the coating on the OxyContin pills, crush them, cook them, and snort or shoot them.  Ms. Sara sent the memo containing the details of OxyContin abuse by drug users not only to the President of Purdue and to its General Counsel, but also to Purdue's then-medical director, and directly to members of the Sackler Families involved in the management of the company, including Richard Sackler, Jonathan Sackler, and Kathe Sackler.

89.     Purdue, Richard Sackler, Jonathan Sackler, and Kathe Sackler were thus all aware of the risk and abuse potential and reality of OxyContin long before Purdue acknowledged the same to government, the healthcare community or the public. In sworn testimony before the U.S. House of Representatives in 2001, Purdue President Michael Friedman, in the presence of Purdue General Counsel Howard R. Udell, swore that the first the companies knew of widespread abuse of OxyContin was in the year 2000.  This was, of course, patently inconsistent with what the members of the Sackler Families knew from the Sara memo they had received in 1999.  No member of the Sackler Families at any time tried to correct the false narrative promulgated far and wide about the abuse liability of OxyContin, nor corrected the false statement about when Purdue became aware of this problem with the drug.

90.     Richard Sackler, Kathe Sackler, Jonathan Sackler, Theresa Sackler, Mortimer D.A. Sackler, and Ilene Sackler have been aware since at least 1999 of potential liability for Purdue, and those acting in concert with Purdue, because of the addictive nature of OxyContin.  With the intention of shielding from creditors the proceeds of their wrongdoing, they have stripped out of Purdue and the Purdue-related Additional Defendants each and every year hundreds of millions of

dollars of profits from the sales of OxyContin and other opioid-containing medications, including a generic form of OxyContin sold by Rhodes Pharma. All such transfers were and are fraudulent within the meaning of applicable fraudulent transfer statutes and case law; all such transfers unjustly enriched the recipients; and all such transferred funds should be clawed back from the Sackler Defendants in order to satisfy the opioid-related liabilities of the companies from which they were transferred.

> **(7)   The Purdue-Related Additional Defendants Continued to Oversee Purdue's Wrongdoing Even after Purdue Was Fined and Warned about Its Conduct.**

91.     From 2001 to 2007, Purdue was investigated by 26 states and the U.S. Department of Justice. Beginning in or about 2003, advised by Baker, who served as legal counsel to the entire Purdue organization and the Sackler Families, all of the Sacklers who served as executive officers of Purdue resigned out of concern that they might be held personally liable for conduct on behalf of Purdue in which they had previously engaged and in which they expected and intended to continue to engage after their respective resignations.

92.     In 2007, PFC agreed to pay nearly $700 million and pleaded guilty to a felony for misleading doctors and patients about opioids.  Purdue admitted that its supervisors and employees, "with the  intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to  abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." At the same time, Purdue executive officers Michael Friedman (the CEO), Howard Udell (Vice President and General Counsel), and Paul Goldenheim (Chief Medical Officer) pleaded guilty to criminal charges that they let Purdue deceive  doctors and patients about its opioids.

93.     As part of the plea agreement in 2007, Purdue agreed to a detailed  Corporate

Integrity Agreement with the U.S. government.  The Agreement required Purdue to  appoint a Compliance Officer who would "be a member of senior management of Purdue,"  "make periodic (at least quarterly) reports regarding compliance matters directly to the Board of  Directors," and "be authorized to report on such matters to the Board of Directors at any time." The Corporate Integrity Agreement was built on the idea that the directors would ensure that  Purdue never deceived doctors and patients again.

94.     The Corporate Integrity Agreement included the directors as "Covered  Persons" from 2007 through 2012.  All Covered Persons, including the directors and CEO, were required to comply with rules that prohibit deception about Purdue opioids.  The directors were required to undergo hours of training to ensure that they understood the rules.  The directors were required to report all violations of the rules.  The directors were warned that they could face consequences if they failed to comply with the rules.  The  directors certified that they had read and understood the rules and would comply with them.

95.     The directors were acutely aware of their obligations under the Corporate Integrity Agreement because, in 2009, Purdue had to report to the Inspector General of the U.S.  Department of Health and Human Services that it had not immediately trained a new director on the  Agreement. Purdue reported: "a new Director was appointed to Purdue's Board of Directors,  without timely notice to either Corporate Compliance or the Office of General Counsel, as  otherwise required by policy, resulting in failure to timely launch the training assignment to this  new Board member." Purdue assured the U.S. government that it had trained the new director: "Relevant personnel were reminded of existing policy to notify Corporate Compliance and the  Office of General Counsel of changes to the Board of Directors.  In both instances, these  individuals completed their training assignments within 1 day of Corporate Compliance learning  of this issue."  Purdue promised the

government that the director's training had addressed "the proper methods of promoting, marketing, selling, and disseminating information about Purdue's products," so Purdue would never deceive doctors and patients again.

96.     Every year since the 2007 guilty plea and Corporate Integrity Agreement, Purdue's directors received warning signs about Purdue's ongoing misconduct and opportunities to stop it.

97.     In 2008, more Americans died from opioid overdoses than ever before.

98.     In 2009, the *American Journal of Public Health* published an article about Purdue's opioid marketing entitled, "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy."  The article detailed Purdue's use of sales representatives, targeting of high-prescribers, and deception about addiction.  That same year, CDC reported that deaths from opioids had recently tripled.

99.     In 2010, *Time* magazine published a story about Purdue's opioids entitled, "The New Drug Crisis: Addiction by Prescription."  Overdoses were the leading cause of accidental death in 15 states.  By the spring of 2010, Purdue's directors had been told that Purdue could not get product liability insurance to cover OxyContin.

100.     In 2011, the White House announced that prescription drug abuse was the nation's fastest-growing drug problem and called for "educating healthcare providers about prescription drug abuse … so they will not over-prescribe[.]"  The CDC announced that prescription opioid overdoses had reached epidemic levels and called out Purdue's opioids by name.  That same year, *Fortune* magazine interviewed Purdue executives, including Vice President Alan Must.  *Fortune* published a story about Purdue, the Sackler Families, and evidence that they profited from opioid addiction.  Mr. Must admitted that Purdue was "well aware" of concerns about its conduct: "We are well aware of detractors.  For those individuals who think we're evil … I don't think there's

anything we can do that is going to change their opinion."

101.     In 2012, the U.S. Senate launched an investigation into whether Purdue was deceiving doctors and patients about opioids.  In a letter to the CEO of Purdue, the Senators warned of "an epidemic of accidental deaths and addiction  resulting from the increased sale and use of powerful narcotic painkillers."  The Senate letter  warned Purdue specifically of the danger of patients taking higher doses: "over the last decade,  the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks while data suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses."  The Senate letter also  warned about Purdue misleading doctors and patients: "There is growing evidence  pharmaceutical companies that manufacture and market opioids may be responsible, at least in  part, for this epidemic by promoting misleading information about the drugs' safety and   effectiveness." The Senate put the directors on notice that they were  under scrutiny, demanding that Purdue produce to investigators a set of "presentations, reports,  and communications to Purdue's management team or board of directors from 2007 to the  present."

102.     In 2013, the *Los Angeles Times* revealed that Purdue had been compiling a list for the past decade of 1,800 doctors suspected of recklessly prescribing its opioids, but Purdue had reported only 8% of them to authorities.  Purdue attorney Robin Abrams gave multiple interviews to the newspaper.   Abrams was a Vice President of Purdue, and she signed Purdue's 2007 settlement agreement.  In 2013, she admitted that Purdue had the list, and said Purdue would not agree to disclose it to authorities  because, "I don't really want to open up an opportunity for folks come in here and start looking and second-guessing."

103.     Abrams and Purdue's directors knew they had reason to fear scrutiny.  The state of Kentucky was prosecuting a lawsuit against Purdue for deceiving doctors and patients about

opioids. Purdue's lawyers surveyed residents who could be on the jury. One-third knew someone who overdosed or was seriously hurt taking a Purdue opioid, and 29 percent knew someone who died. Purdue itself filed those statistics in court.

104.    In 2014, Edward Mahony, the Executive Vice President, CFO, and Treasurer of Purdue stated that the Kentucky lawsuit was so significant that it could "jeopardize Purdue's long-term viability." That same year, the Governor of Massachusetts declared the opioid crisis a public health emergency.

105.    In 2016, the CDC published the *CDC Guideline for Prescribing Opioids for Chronic Pain* to try to stop dangerous opioid prescribing.

106.    In 2017, the President of the United States declared the opioid crisis a national public health emergency.

107.    PPI's directors knew or should have known about these warnings and many others.

108.    The directors knew about, allowed, and directed Purdue's deception. They oversaw Purdue's scheme to send sales representatives to visit doctors thousands of times. They oversaw Purdue's scheme to hire top prescribers to promote its opioids. They oversaw Purdue's effort to get more patients on higher doses of opioids for longer periods. They were aware of, allowed and directed the content of the messages conveyed in Purdue's marketing.

109.    The directors of PPI controlled PPLP. The quarterly reports distributed to the directors of PPI demonstrate that the directors in fact controlled both PPI and PPLP. The reports and minutes make clear that the directors of PPI were kept fully informed of the activities of Purdue in the areas "Finance," "Sales & Marketing," "Manufacturing & Supply Chain," "Quality," "Research & Development," "Discovery Research," "Licensing & Business Development," "Corporate Compliance," "External Affairs," "Health Policy," "Human Resources," and

"Information Technology" — all of which were overseen by the directors.

110.    The directors oversaw Purdue's sales representatives.  Richard  Sackler testified that the sales representatives were the main way that Purdue promoted its opioids.  He testified that the key to getting doctors to prescribe and keep prescribing Purdue opioids was regular visits from the sales force.  The board tracked the exact number of sales representatives and the exact number of visits they made to urge doctors to prescribe Purdue opioids.  The board knew which drugs were promoted; how many visits sales representatives averaged per workday; how much each visit cost Purdue; and the company's plan for sales visits in each upcoming quarter.  The Board approved specific plans to hire new sales representatives, hire and promote new District and Regional managers, and create sales "territories" in which representatives would target doctors.

111.    The directors oversaw the tactics that sales representatives used to push opioids.  A board report analyzed a Purdue initiative to use iPads during sales visits, which increased the average length of the sales meeting with the doctor to "16.7 minutes in front of the customer."

112.    The directors oversaw promotional claims that representatives presented to doctors during sales visits.  They received reports, for example, that a "review of call notes" recorded by Purdue sales representatives "suggested potential comparative claims of superiority of Purdue products relative to competitors," and deceptive promotion of opioids as treatment for "minor pain," including hundreds of examples of deceptive marketing that required "extensive remedial actions."

113.    The directors oversaw Purdue's research, including research that contradicted its marketing.  The board received reports about studies of Purdue opioids in "opioid-naïve" patients and patients with osteoarthritis, down to the details of the strategy behind the studies and the

28

enrollment of the first patients.

114.    The directors oversaw Purdue's improper response to signs of "abuse and diversion" by high-prescribing doctors.  The board was told exactly how many "Reports Of Concern" Purdue sales representatives submitted to the company about doctors they visited to promote opioids (572 Reports Of Concern in the July 2007 board report); how many "field inquiries" Purdue had decided to conduct in response to the reports (21 inquiries in response to 572 Reports Of Concern); and even that six Reports Of Concern were submitted in Massachusetts.

115.    The directors even monitored sales representatives' emails.  Purdue held thousands of face-to-face sales meetings with doctors, but the company prohibited its sales representatives from writing emails to doctors, which could create evidence of Purdue's misconduct.  When Purdue found that some sales representatives had emailed doctors, the company conducted an "investigation" and reported to the board that sales representatives had been disciplined and that their emails would be discussed at the board meeting.

116.    The directors also oversaw Purdue's strategy to pay high prescribers to promote Purdue opioids. A report for the board listed the exact number of conferences and dinner meetings, with attendance figures, and assured the directors: "We are tracking the prescribing trends of these attendees following the programs and will report the results in future reports." The board was told the amounts paid to certain doctors, and they received detailed reports on the Return on Investment that Purdue gained from paying doctors to promote its drugs.  The board was told that Purdue would allow a "spending limit for gifts" of $750 per doctor per year; and that the directors should personally report when they gave money, meals, or gifts to doctors to promote Purdue drugs.  The board was told explicitly that paying doctors to promote opioids was "a high risk activity, in view of the potential for off-label or other improper promotional conduct by third parties during such

activities."  When Congress  required disclosure of drug company payments to doctors, the board

was told there were "significant compliance implications" for Purdue.

117.    The directors also oversaw Purdue's strategy to push patients to higher  doses of

opioids — which are more dangerous, more addictive, and more profitable.  The board  routinely

received reports on Purdue's efforts to push patients to higher doses.  A report alerted the board

that "Net sales of the 40 and 80 mg strengths of OxyContin" had fallen below Purdue's  targets in

the fall of 2010 and were $85 million below budget.   By summer, the board learned  that income

was $500 million below budget "mainly due to declining sales in 40 mg and 80 mg  strengths.  By

fall, the board reviewed an assessment that Purdue had lost more than $800  million in revenue

because patients weren't taking enough 40 mg and 80 mg doses.   The board dug into the issue.

Multiple reports to the board identified as a "threat" an initiative by public  health authorities to

save lives by requiring doctors to consult with pain specialists before  prescribing opioid doses

higher than 80mg/day. The CEO and directors oversaw Purdue's  effort to push back against that

public health "threat." Executives were pleased to report to the  directors in 2013 that "initiatives

to validate increased total daily doses are having impact in the  field."

118.    The directors also oversaw Purdue's scheme to use higher doses of opioids to keep

patients on drugs for longer periods of time.  The board received detailed reports  of how many

patients stayed on Purdue's opioids for long periods (for example, longer than 35 days), along with

Purdue's internal research showing that getting patients on higher doses  keeps them on the drugs

longer — all of which puts patients at greater risk of addiction and death.  The board received the

confidential results of a study of 57,000 patients that Purdue  performed explicitly to determine

how opioid dose "influences patient length of therapy."  The  results showed that patients on the

highest doses "are the most persistent."   The "Recommended Actions" presented to the board

included "additional workshops for the sales force" and "specific direction" to the sales representatives about using higher doses to keep patients on drugs longer.

119.    The board was told in writing that encouraging higher doses "is a focal point of our promotion," and that sales representatives would "emphasize the importance" of increasing patients' opioid doses, as soon as 3 days after starting treatment. The board even tracked specific sales materials, such as "two new patient profiles designed to improve patient  identification and titration" – to get more opioid-naïve and elderly patients on higher doses of  opioids for longer periods of time. The board was told the exact research behind the sales  strategy: higher doses would keep patients on drugs longer because Purdue had found that "83% of patients who discontinued were never titrated to higher doses."  The directors knew or should have known that Purdue's sales strategy was deceptive and that putting patients  on opioids at higher doses and for longer periods increased the risk of addiction, overdose, and  death.

120.    The directors also oversaw Purdue's strategy of using "savings cards" to  get patients on Purdue opioids for longer periods.  The board knew how many thousands of cards  were used each quarter, how the company calculated the Return On Investment, and that the  explicit goal of the program was to hook patients to "remain on therapy longer."

121.    The directors also oversaw Purdue's strategy to target prescribers who did not have special training in opioids (primary care doctors, nurse practitioners, and physician  assistants) because they "show the highest responsiveness" to Purdue's sales push. Purdue   continued that strategy even though the DEA had expressed concern that Purdue was promoting  opioids to clinicians who were not adequately trained in pain management.  The directors also oversaw Purdue's strategy to target elderly patients by promotion "targeted to HCPs  that practice in the long term care setting," even down to the details of advertising that  "leverages images of older

31

patients." The directors knew or should have known that Purdue's sales strategy was deceptive and that targeting primary care doctors and elderly patients increased the risk of addiction, overdose, and death.

122.    The directors also oversaw Purdue's push to steer patients away from safer alternatives. They tracked the company's effort to emphasize "the true risk and cost consequence of acetaminophen-related liver toxicity." The board even oversaw Purdue's deceptive websites, and received reports about the specific section that was found to be deceptive by the New York Attorney General.

123.    The directors also oversaw Purdue's response to signs that patients were being harmed. Reports of harm came in by the hundreds and even thousands. One board report explained that "in excess of 5,000 cases with alleged adverse events have already been received and processed by Drug Safety and the Litigation Support group" during a single quarter.

124.    Each of the reports described above was sent to every Sackler Defendant on the board at the time they were prepared.

125.    Stuart Baker also received all of the reports described above.

## COMMON FACTUAL ALLEGATIONS

3.      By checking the boxes in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the *Summit County* Pleadings as identified in the Court's Order implementing the Short Form procedure.  Dkt. # 1282.

☒ Common Factual Allegations (Paragraphs 130 through 670 and 746 through 813)

☒ RICO Marketing Enterprise Common Factual Allegations  (Paragraphs 814-848)

☒ RICO Supply Chain Enterprise Common Factual Allegations  (Paragraphs 849-877)

4.      If additional claims are alleged below that were not pled in Plaintiff's Existing Complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here.  Plaintiff(s) assert(s) the following additional facts to support the claim(s) identified in Paragraph 6 below (below or attached):

None.

## CLAIMS

5.      The following federal **RICO causes of action** asserted in the *Summit County* Pleadings as identified in the Court's implementing order and any subsequent amendments, Dkt. 1282, are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff(s)'s Existing Complaint (check all that apply):

☒ First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Marketing Enterprise (Against Defendants Purdue, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (*Summit County* Pleadings, Paragraphs 878-905)

☒ Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (*Summit County* Pleadings, Paragraphs 906-938)

6.      Plaintiff asserts the following **additional claims** as indicated (below or attached):

None.

7.      To the extent Plaintiff(s) wish(es) to **dismiss claims** previously asserted in Plaintiff(s)'s Existing Complaint, they are identified below and will be dismissed without prejudice.

None.

WHEREFORE, Plaintiff(s) prays for relief as set forth in the *Summit County* Pleadings in *In Re National Prescription Opiate Litigation* in the United States District Court for the Northern District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

Dated:  March 16, 2019          */s/ Richard J. Arsenault*

**NEBLETT, BEARD & ARSENAULT**
Richard J. Arsenault (LA Bar No. 02563)
Dawn M. Chmielewski (OH Bar No. 0077723)
Dustin C. Carter (MS Bar No. 104941)
2220 Bonaventure Court
P.O. Box 12120
Alexandria, Louisiana 71315
Telephone: (800) 256-1050
Fax: (318) 561-2591
E-mail: rarsenault@nbalawfirm.com
E-mail: dchmielewski@nbalawfirm.com
E-mail: dcarter@nbalawfirm.com

**GOLD WEEMS BRUSER SUES & RUNDELL**
Gregory B. Upton
2001 MacArthur Drive
P.O. Box 6118
Alexandria, LA 71307-6118
Phone: (318) 445-6471
Fax: (318) 445-6476
Email: gupton@goldweems.com

**THE LANIER LAW FIRM**
W. Mark Lanier
Richard D. Meadow
Evan M. Janush
Reagan E. Bradford
6810 FM 1960 Rd W
Houston, TX 77069-3804
Phone: (713) 659-5200
Fax: (713) 659-2204
E-mail: wml@lanierlawfirm.com
E-mail: Evan.Janush@lanierlawfirm.com
E-mail: Reagan.Bradford@LanierLawFirm.com

*Counsel for Plaintiff*


<u>**CERTIFICATE OF SERVICE**</u>


I HEREBY CERTIFY that on  this 16th day of March 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System. The foregoing will be served on counsel of record by way of the electronic filing CM/ECF System, as well as in accordance with this Court's Case Management Order One [Doc. 232] dated April 11, 2018 and pursuant to each Defendant's filed Notices identifying the person(s) and means of effecting waiver of service of process.


 */s/ Richard J. Arsenault*
Richard J. Arsenault